IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RAYMOND HUME,                                    Case No. 3:16-cv-01766-SB

     Plaintiff,                              **OPINION AND ORDER**

     v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

     Defendant.

_____

**BECKERMAN, Magistrate Judge.**

     Raymond Scott Hume ("Hume") brings this appeal challenging the Commissioner of

Social Security's ("Commissioner") denial of his applications for Social Security disability

insurance benefits and Supplemental Security Income under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The Court has jurisdiction to hear this appeal

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, the Court affirms

the Commissioner's decision because it is free of legal error and supported by substantial

evidence.

## BACKGROUND

Hume stands six feet, three inches tall and weighs approximately 275 pounds. He was born in February 1957, making him fifty-five years old on October 12, 2012, the alleged disability onset date. Hume completed three years of college, and his past relevant work includes time as a surveillance system monitor. Hume alleges disability due primarily to anxiety, chronic pain, and depression.

On February 20, 2012, roughly eight months before Hume stopped working and alleges the onset of disability, Hume visited the emergency department at Legacy Meridian Park Medical Center, complaining of weakness, dizziness "with some vertiginous symptoms," and intermittent chest pain. (Tr. 360-61.) Hume underwent an "extensive imaging workup," which did "not show any acute vascular event." (Tr. 361.) The attending physician, Dr. Sanjiv Panwala ("Dr. Panwala"), noted that Hume's low heart rate "certainly could explain his fatigue and dizziness," and discontinued a medication that was likely contributing to Hume's condition. (Tr. 361.)

On July 10, 2012, Hume presented for an annual visit with Dr. Charles Douville ("Dr. Douville") regarding a "known dilated ascending aorta and root." (Tr. 400.) Dr. Douville noted that Hume's ascending aorta was "really unchanged in size over the previous examination," and that Hume's control of his blood pressure was "suboptimal" and had "been a struggle." (Tr. 401.) Dr. Douville informed Hume that "he is still best served by continued medical therapy and observation," and recommended that Hume undertake an "aggressive weight loss" program. (Tr. 401.)

On November 8, 2012, a magnetic resonance imaging ("MRI") of Hume's lumbar spine revealed no "significant change" when compared with imaging from January 2007, "[m]ild multilevel disc and facet degenerative changes," and "[n]o significant central canal or foraminal

stenosis." (Tr. 409; *see also* Tr. 424, noting that the MRI of Hume's lumbar spine revealed that he has "facet hypertrophy" and "a mild disc bulge to the right," but not "anything surprising or serious").

On February 22, 2013, Hume visited his primary care physician, Dr. Michael Booker ("Dr. Booker"), for a follow-up regarding his blood pressure. Hume reported that he wanted "to be on disability," did not "want to return to work," and wanted "to sue his employer." (Tr. 521.) He also complained of increased discomfort in his left shoulder, chronic back pain, depression, and personal and financial stressors. Hume and Dr. Booker, who had routinely encouraged Hume to engage in exercise and lose weight as a means to control his blood pressure (*see* Tr. 432, 435-36, 564), discussed the fact that if Hume's blood pressure was "not controlled his life threatening condition of uncontrolled hypertension, history of stroke, and his aneurysm [are] very concerning." (Tr. 522.)

On March 9, 2013, Hume was referred to Dr. Donald Ramsthel ("Dr. Ramsthel") for a consultative examination. Hume reported that his "primary perceived disabling issues" were his lower back pain, aortic aneurysm, anxiety, and depression, that he "can do his" activities of daily living, and that his level of activity is "sedentary to mild, mostly due to his anxiety and depression." (Tr. 477-78.) Based on the results of his examination, Dr. Ramsthel estimated that Hume can stand or walk "for at least [thirty] minutes at a time before needing to sit down, translating into about [three to four] hours out of an [eight]-hour day," can sit two "hours at a time, translating into [four to six] hours out of an [eight]-hour day," can lift and carry forty pounds "infrequently" and twenty pounds frequently, would be somewhat limited in his ability to handle objects on a "repetitive basis . . . due to his chronic left shoulder pain and instability," and

would be limited in his ability to travel due primarily "to his mental issues rather than his physical issues." (Tr. 480.)

On March 12, 2013, Dr. Sharon Eder ("Dr. Eder"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 92-94.) Dr. Eder concluded that Hume could lift and carry twenty pounds occasionally and ten pounds frequently; stand, sit, or walk up to six hours during an eight-hour workday; push or pull in accordance with his lifting and carrying restrictions; occasionally stoop and climb ramps, stairs, ladders, ropes, and scaffolds; and frequently balance, kneel, crouch, and crawl. Dr. Eder also concluded that Hume does not suffer from any manipulative, visual, communicative, or environmental limitations.

On March 20, 2013, Dr. Irmgard Friedburg ("Dr. Friedburg"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 91.) Based on her review of the record, Dr. Friedburg concluded that the limitations imposed by Hume's impairments failed to satisfy listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).

On April 10, 2013, an x-ray of Hume's chest revealed "[n]o active cardiopulmonary disease." (Tr. 583.)

On May 14, 2013, an MRI of Hume's brain revealed "small infarcts" and "no acute intracranial abnormality." (Tr. 488.)

On August 28, 2013, Hume returned to Dr. Booker's office, complaining of back pain, dizziness, vertigo, and issues with his eyes. (Tr. 511.) In his treatment note, Dr. Booker observed that the neurology department believed that Hume had a "tendency towards somatizations," Hume focuses on his health problems "to an unhealthy extent," "[n]o singular problem would

qualify for disability," there was "no reason [Hume] could not try to work as he does have employment options where he did work," and Hume "should try going back to work to help keep him occupied." (Tr. 513.)

In a vestibular lab report dated September 11, 2013, Dr. Jeffrey Brown ("Dr. Brown") noted that his examination revealed that Hume was at "a very high risk of falls and injury" due to balance issues and thus should avoid "uneven ground or moving surfaces." (Tr. 1286.) He also recommended that Hume undergo"[b]alance therapy and, perhaps, [use an] assistive device[.]" (Tr. 1286.)

On October 31, 2013, Dr. Martin Kehrli ("Dr. Kehrli"), a non-examining state agency physician, issued a physical residual functional capacity assessment, wherein he agreed with Dr. Eder's conclusion that Hume can lift and carry twenty pounds occasionally and ten pounds frequently; stand, sit, or walk up to six hours during an eight-hour workday; push or pull in accordance with his lifting and carrying restrictions; occasionally stoop and climb ramps, stairs, ladders, ropes, and scaffolds; and frequently balance, kneel, crouch, and crawl. (Tr. 124-25.) Dr. Kehrli also agreed with Dr. Eder's conclusion that Hume does not suffer from manipulative, visual, or communicative limitations, but disagreed with Dr. Eder's conclusion that Hume does not suffer from environmental limitations, such as the need to avoid concentrated exposure to noise and hazards.

On November 21, 2013, Hume was referred to Dr. Daniel Scharf ("Dr. Scharf") for a psychodiagnostic examination. (Tr. 584-88.) During the examination, Hume "primarily focused on his physical difficulties of reported back and neck pain as his main barriers to working," but also reported "consistent low-level depression and very mild anxiety which were not evident on examination." (Tr. 584, 586.) Based on his examination, Dr. Scharf's diagnostic impressions

were that Hume suffers from a "moderate" depressive disorder and a "mild" anxiety disorder, exhibited "no objective signs of cognitive problems," "was able to understand and remember instructions and sustain concentration and attention," "would have difficulties with persistence in his attention after [one to two] hours," and "was able to engage in appropriate social interaction." (Tr. 586.)

On December 2, 2013, Dr. Dorothy Anderson ("Dr. Anderson"), a non-examining state agency psychologist, issued a psychiatric review technique assessment, agreeing with Dr. Friedburg's conclusion that Hume's mental impairments failed to satisfy listings 12.04 and 12.06, and noting that Hume's impairments also failed to satisfy listing 12.07 (somatoform disorders). (Tr. 122.)

On August 7, 2014, an MRI of Hume's cervical spine revealed "[m]ultilvel degenerative disc disease, "[l]eft foraminal stenosis at C6-7," and a "focal area of abnormal enhancement" that "could represent a spondylo-diskitis, focal osteomyelitis or possible neoplastic process." (Tr. 803-04.)

On September 11, 2014, an MRI of Hume's left shoulder revealed "[m]oderate osteoarthritic changes . . . of the glenohumeral and acromioclavicular joints" and "[m]ild tearing . . . of the supraspinatus and infraspinatus tendons at their insertion sites on the humeral head[.]" (Tr. 949.)

On October 10, 2014, Hume underwent an electrodiagnostic evaluation that showed "evidence of a sensory-motor ulnar neuropathy at the left elbow" that was "not clearly symptomatic" and did not require surgery. (Tr. 795.) Hume also underwent an electromyography that did "not identify cervical motor radiculopathy" or "exclude a sensory-only radiculopathy." (Tr. 795.)

On October 19, 2014, Hume had computed tomography ("CT") scans taken of his chest, abdomen, and pelvis, which revealed "[n]o aortic aneurysm or dissection," and an enlarged heart "with pulmonary findings suggesting venous congestion and possibly early [congestive heart failure]." (Tr. 833.) It was later determined that Hume "does not have a diagnosis of congestive heart failure." (Tr. 970.)

On November 19, 2014, Hume presented for a follow-up visit with Dr. Booker regarding his back pain. Hume reported that his back pain was "worse" and that he was "having a very hard time walking." (Tr. 965.) Dr. Booker noted that Hume believed there was a "surgical solution but surgery didn't have a clear opinion about [Hume] being a surgical candidate given his MRI lumbar results." (Tr. 965.) Dr. Booker added that he did not "feel [Hume] is a surgical candidate for his lumbar degenerative changes," and it was "[m]ore important to get his blood pressure down." (Tr. 967.)

In a treatment note dated January 28, 2015, Dr. Booker noted that Hume complained of "ongoing neck pain" and "numerous lipomas he would like to see surgery about again," and that Dr. Booker did not "think he needs surgery for the lipoma in question" or that Hume "has a surgical issue with his neck for any symptoms but [would] follow up with neurosurgery." (Tr. 958-60.)

On February 6, 2015, an MRI of Hume's cervical spine revealed a "[s]table lesion involving the upper endplate of C7 to the left of midline with extension into the adjacent C6-7 discs." (Tr. 807.) Dr. Steve Urman ("Dr. Urman") "doubt[ed]" that Hume's lesion "represents a focus of infection but rather is more typical of a vascular lesion or atypical hemangioma." (Tr. 807.)

On March 9, 2015, Hume was referred to a neurosurgeon, Dr. Claudia Martin ("Dr. Martin"). Dr. Martin "[r]eassured" Hume that his recent "cervical MRI finding [was] benign." (Tr. 1290.) During a follow-up visit, Hume exhibited full motor power "in all lower extremity muscle groups," Dr. Martin noted that Hume "does not need any lumbar surgery," Dr. Martin "[d]iscussed conservative treatment for back pain" with Hume, and Dr. Martin added that she did "not understand what was [purportedly] recommended to [Hume] by an outside neurosurgeon." (Tr. 1289.)

In a treatment note dated June 17, 2015, Dr. Booker noted that Hume complained of pain in his right foot, that Vicodin "helps with [Hume's] low back pain," that Hume reported seeing a therapist had "been helpful," that Hume's "plantar fasciitis symptoms [were] improving" as the result of "home exercises and stretching," that "[i]n the long run weight loss would be helpful," and that Hume's plantar fasciitis was "improving as expected." (Tr. 1299-1300.)

On June 25, 2015, Hume's psychologist, Dr. James Born ("Dr. Born"), completed a medical source statement at the request of Hume's counsel. (Tr. 1106-10.) Dr. Born stated, *inter alia*, that he has treated Hume on a weekly to bi-weekly basis since January 2015, and that Hume suffers from severe depression and anxiety; extreme impairment in his ability to maintain concentration, persistence, or pace; and marked impairment in social functioning, his activities of daily living, and his ability to "maintain attention and concentration for extended periods," "perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances," "sustain an ordinary routine without special supervision," "work in coordination with or proximity to others without being distracted by them," "complete a normal workday and workweek without interruptions from psychologically based symptoms and to

perform at a consistent pace without an unreasonable number and length of rest periods," and

"maintain socially appropriate behavior and to adhere to basic standards of neatness and

cleanliness." (Tr. 1109.) Dr. Born added that Hume would miss sixteen hours or more per month

"from even a simple, routine job because of his impairments, symptoms, medications, and their

side effects," and that Hume "wants to be able to work but his limitations are too challenging."

(Tr. 1110.)

On July 1, 2015, Hume appeared and testified at a hearing before an Administrative Law

Judge ("ALJ"). (Tr. 39-84.) Hume testified that he attempted to work after suffering a stroke and

heart attack; he last worked in October 2012; and during "the last couple of years," his security-

related position was more of a "desk job" that involved monitoring surveillance equipment,

operating a computer and telephone, and monitoring those who accessed the facility using

"security badges and clearances." (Tr. 43, 76, 324.) Hume cited several barriers that prevent him

from returning to work, including stress intolerance, "back issues," "vertigo and dizziness,"

"balance problems" that resulted in "falling down a lot," mental anguish stemming from his

brother's suicide in 2006, nightmares, and "seeing dark figures" and "a lot of doors rattling"

while at work. (Tr. 44.) Hume added that he suffers from depression, anxiety, insomnia, arthritis

in his shoulders, headaches, urinary incontinence, chronic pain in his neck, head, lower back, left

hip, and shoulders, nerve damage in his elbows and right leg, numbness in his right foot, plantar

fasciitis, and poor vision. In terms of his functional capacity, Hume estimated that he could "only

walk two to ten minutes, stand only for five to [ten] minutes, and sit for about [thirty] minutes."

(Tr. 59.)

The ALJ posed a series of hypothetical questions to a Vocational Expert who testified at

Hume's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Hume's

age, education, and work experience could perform light work that involved: (1) lifting and carrying twenty pounds occasionally and ten pounds frequently, (2) sitting, standing, and walking up to six hours in an eight-hour workday, (3) pushing and pulling in accordance with his lifting and carrying restrictions, (4) occasionally stooping and climbing ramps, stairs, ladders, and scaffolds, (5) frequently balancing, kneeling, crouching, and crawling, (6) moderate noise levels; (7) making simple work-related decisions, (8) simple, routine, repetitive tasks, (9) no exposure to unprotected heights or operating heavy machinery, (10) never "operating a motor vehicle as part of the day-to-day job," and (11) occasional interaction with co-workers and the public. (Tr. 72.) The VE testified that the hypothetical worker could perform Hume's desk job as a "surveillance system monitor," but the worker could not perform Hume's past work as a "loader/unloader" or "security guard" (i.e., the patrolling-related security work performed by Hume before there were "cutbacks" and his position turned into more of a "desk job"). (Tr. 43, 72, 76.) The VE also testified that the worker could be employed as an office helper and photo copy machine operator.

Second, the ALJ asked the VE to assume that the hypothetical worker described above was "limited to occasional reaching overhead with the left upper extremity." (Tr. 73.) The VE testified that he did not "believe that . . . would necessarily preclude the occupations identified." (Tr. 73.) Responding to the ALJ's third hypothetical, the VE confirmed that a worker could not sustain gainful employment if he needed to recline or lie down on an occasional basis during the workday.

Fourth and finally, the ALJ asked the VE to assume that the hypothetical worker did not need to be limited to simple, routine, repetitive tasks, or to occasional interaction with co-workers and the general public. The VE testified that the hypothetical worker described could

perform Hume's past work as a security guard and surveillance system monitor. Responding to follow-up questions posed by Hume's counsel, the VE confirmed that, based on the job description set forth in the Dictionary of Occupational Titles ("DOT") and the VE's own work "experience," the surveillance system monitor job "does not entail more than occasional" social interaction. (Tr. 82-83.)

In a medical condition certification dated September 30, 2015, Dr. Douville stated that "[Hume] has a thoracic (ascending) aortic aneurysm which is being followed for evidence of enlargement," that Hume's aorta "is currently 4.7 [centimeters] on his last CT scan," and that "[w]hen [the aorta] reaches 5-5.5 [centimeters] in size, it will require open cardiac surgery[.]" (Tr. 1293.)

On October 12, 2015, Hume visited Dr. Booker's office, complaining of foot and thigh pain, and "wonder[ing]" whether he might suffer from fibromyalgia. (Tr. 1278.) Dr. Booker noted that an x-ray showed "arthritic changes" at the distal interphalangeal joint of Hume's toe, that Hume wanted to see a specialist regarding his toe, but Dr. Booker did not believe that it "look[ed] severe enough on the x-ray to consider fusion," that Dr. Booker did not "think [Hume] has fibromyalgia," and that Hume's depression "amplifies everything," including his "physical problems." (Tr. 1280.)

In a written decision issued on September 1, 2015, the ALJ applied the five-step process set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and found that Hume was not disabled. *See infra*. The Social Security Administration Appeals Council denied Hume's petition for review, making the ALJ's decision the Commissioner's final decision. Hume timely appealed to federal district court.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

## I.    LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.     THE ALJ'S DECISION

The ALJ first determined that Hume had not engaged in substantial gainful activity since October 12, 2012, the alleged disability onset date. At the second step, the ALJ found that Hume had the severe impairments of "degenerative disc disease of the lumbar and cervical spine; obesity; aortic aneurism; hypertension; coronary artery disease; history of cerebrovascular accident; degenerative joint disease of the left shoulder; depressive disorder; anxiety disorder; and somatization." (Tr. 18.) At the third step of the process, the ALJ determined that Hume did not have an impairment or combination of impairments that met or equaled one of the Listed Impairments.

The ALJ next assessed Hume's residual functional capacity ("RFC") and found that he could perform light exertion work that involves (1) lifting and carrying up to twenty pounds occasionally and ten pounds frequently; (2) sitting, standing, and walking up to six hours in an eight-hour workday; (3) pushing and pulling in accordance with Hume's lifting and carrying restrictions; (4) occasionally interacting with co-workers and the public, reaching overhead, reaching with the left upper extremity, stooping, and climbing ramps, stairs, ladders, ropes, and scaffolds; (5) frequently balancing, kneeling, crouching, and crawling; (6) never working "around unprotected heights," never operating heavy machinery, and never operating "a motor vehicle," (7) avoiding "even moderate exposure to noise," (8) "simple tasks, routine and repetitive tasks, and . . . simple work-related decisions." (Tr. 22.) At step four, the ALJ concluded that Hume is capable of performing his past relevant work as a surveillance system monitor. Accordingly, the ALJ found that Hume was not disabled within the meaning of the Social Security Act.

**STANDARD OF REVIEW**

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

**DISCUSSION**

In this appeal, Hume argues that the ALJ erred by: (1) failing to provide legally sufficient reasons for discounting the opinion of his treating psychologist, Dr. Born; (2) concluding that Hume is capable of performing his past relevant work as a surveillance system monitor; and (3) failing to reconcile the "apparent conflict" between the VE's testimony and the DOT. (Pl.'s Opening Br. at 4.) As explained below, the Court finds that the ALJ's decision is free of legal error and supported by substantial evidence. Accordingly, the Court affirms the Commissioner's decision.

# I.   MEDICAL OPINION EVIDENCE

## A.   Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002)). "An ALJ may only reject a treating physician's contradicted opinions by providing specific and legitimate reasons that are supported by substantial evidence." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (citation and quotation marks omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

///

///

///

## B. Application of Law to Fact

Hume argues the ALJ failed to provide legally sufficient reasons for discounting Dr. Born's medical source statement dated June 25, 2015. (Pl.'s Opening Br. at 5-7.) The Court disagrees.

Dr. Born's medical source statement conflicts with the opinions of the state agency medical consultants, none of whom opined, for example, that Hume suffers from marked limitations in social functioning or extreme limitations in his ability to maintain concentration, persistence, or pace. (*Compare* Tr. 91, *and* Tr. 122, *with* Tr. 1108.) Therefore, the ALJ needed to provide specific and legitimate reasons for discrediting Dr. Born's opinion. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'"); *Killan v. Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Killian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The Court concludes that the ALJ did so here.

First, the ALJ discounted Dr. Born's opinion because it was inconsistent with the opinion of Hume's primary care physician. This is a specific and legitimate reason for discounting a doctor's opinion. *See Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 600-03 (9th Cir. 1999) (holding that the ALJ provided specific and legitimate reasons for rejecting a treating doctor's opinion, and noting that "[i]nconsistency between [the treating doctor's] and [examining doctor's] conclusions provided the ALJ additional justification for rejecting [the treating doctor's] opinion"); *see also Perry v. Colvin*, No. 15-1356, 2016 WL 3570774, at *4 (W.D. Wash. July 1, 2016) ("[I]nconsistency between medical opinions is a specific and legitimate

reason to give less than full weight to a treating physician's opinion."). For example, the ALJ assigned "little weight" to Dr. Born's opinion, noting, among other things, that the record evidence did not support Dr. Born's opinion that Hume suffers from any marked mental health limitations. (Tr. 27.) The ALJ then proceeded to assign "significant weight" to the opinion of Hume's long-time treating physician, Dr. Booker, who is "familiar with all of" Hume's medical conditions and "felt there was no reason [Hume] could not try to work despite his symptoms." (Tr. 27-28.) Substantial evidence supports the ALJ's conclusion that Dr. Born's opinion is inconsistent with Dr. Booker's opinion. (*Compare* Tr. 511-13, noting that Dr. Booker had treated Hume's mental and physical impairments, that Dr. Booker did not believe that any "singular problem would qualify [Hume] for disability," that Dr. Booker felt "[t]here is no reason [Hume] could not try to work as he does have employment options where he did work," and that Dr. Booker thought Hume "should try going back to work to help keep him occupied," *with* Tr. 584-88, opining that Hume suffers from mental limitations that would preclude gainful employment, *and* Pl.'s Opening Br. at 6-7, noting that the "ALJ held that Dr. Born's findings were inconsistent with the opinions of other doctors," and that Dr. Born's opinion supports a finding of disability). Accordingly, this inconsistency constitutes a specific and legitimate reason for discounting Dr. Born's opinion.[1]

---

[1] The Court notes that Dr. Booker has treated Hume's mental impairments since at least August 2010, and that Dr. Born served as Hume's counselor for approximately six months before issuing his opinion. (*See* Tr. 565, listing depression and anxiety among Hume's past medical problems in a treatment note dated August 27, 2010, Tr. 1106, 1110, noting that Dr. Born issued his opinion on June 25, 2015 and had been treating Hume or a weekly to bi-weekly basis since January 15, 2015). Before discounting Dr. Born's opinion evidence, the ALJ noted that Dr. Born had only treated "the claimant for about six months." (Tr. 27.) In assigning significant weight to Dr. Booker's opinion, the ALJ observed that Dr. Booker was Hume's "longtime treating physician and he is familiar with all of the [Hume's conditions." (Tr. 28.) "The length of a treating relationship is a specific and legitimate reason to reject a treating [doctor] and give the

Second, the ALJ discounted Dr. Born's opinion on the ground that it was inconsistent with Hume's testimony. (*See* Tr. 27, citing Hume's inconsistent testimony regarding his social functioning as grounds for discounting the opinion of Dr. Born, who opined that Hume suffers from marked limitations in social functioning). This is a specific and legitimate reason for discounting a doctor's opinion. *See Arthurs v. Colvin*, 644 F. App'x 749, 749-50 (9th Cir. 2016) (holding that the ALJ provided specific and legitimate reasons for discounting a treating doctor's opinions, and noting that the doctor's opinions were inconsistent with the claimant's testimony); *Stanley v. Astrue*, No. 09-1743, 2010 WL 4942818, at *6 (E.D. Cal. Nov. 30, 2010) (noting that a claimant's inconsistent testimony is a specific and legitimate reason for rejecting a doctor's opinion (citing *Andrews*, 53 F.3d at 1043)). Substantial evidence supports the ALJ's finding that Hume's testimony is inconsistent with Dr. Born's opinion. (*Compare* Tr. 1108, opining that Hume suffers from "[m]arked" limitations in social functioning, "[m]arked" impairment in his activities of daily living, and "[e]xtreme" impairment in maintaining concentration, persistence, or pace, *with* Tr. 42, 58, 585-86, 1022, 1066, stating that Hume reported that he lives with a friend who helps him pay his bills, became engaged during the period of disability, gets "together with friends approximately once a month," has friends who "will come over" to his house, was able to go to the "movies or out to eat" every other week in late 2012 with his then-girlfriend, and was able to "engage in appropriate social interaction" throughout a consultative examination, *and* Tr. 478, 584-86, stating that Hume reported that he "can do his [activities of daily living]," he experiences only "periodic difficulties with" his activities of daily living, he "vacuums small sections of his home once every [two] days," he "does dishes regularly and does his laundry once every [two] weeks," he "periodically cooks and prepares his own meals," he

[doctor's] opinion less weight." *Carrigan v. Colvin*, No. 13–458, 2014 WL 1757208, at *8 (E.D. Cal. Apr. 30, 2014).

"shops for groceries once every [ten] days or so," he drives, he "is able to manage his money," he is able to maintain the concentration necessary to "spend a lot of time during the day filling out paperwork," and his "back and neck pain," not mental health-related impairments, were his "main barrier to working").[2]

Third, the ALJ discounted Dr. Born's opinion because it was contradicted by the objective medical evidence, which is a specific and legitimate reason for discounting a doctor's opinion. *See Ruckdashel v. Colvin*, 672 F. App'x 745, 745-46 (9th Cir. 2017) (holding that the ALJ provided specific and legitimate reasons for rejecting a treating physician's opinion by stating, among other things, that the physician's opinion was "contradicted by the objective medical evidence"). For example, the ALJ observed that Dr. Born opined that Hume's mental impairments prevent him from working, which the ALJ determined was "inconsistent with [Hume's] normal findings on mental status exam[ination] with other doctors." (Tr. 27.) Substantial evidence supports the ALJ's finding that Dr. Born's opinion was contradicted by objective medical evidence. (*Compare* Tr. 1107-10, opining that Hume suffers from severe anxiety, depressive symptoms, and cognitive impairments that prevent him from working, *with* Tr. 480, observing that Hume's mental status examination "was entirely normal except for memory recall, which is [two] out of [three]," Tr. 586, noting that Hume's "attention and concentration were generally intact on [mental status examination tasks]," "[t]here were no objective signs of cognitive problems" when Hume was examined by a clinical psychologist, Hume's reported level of anxiety "was inconsistent with his presentation at the outset of the

---

[2] The ALJ's decision did not explicitly rely on all of these inconsistencies, but it is nevertheless appropriate for the Court to consider additional support for a ground on which the ALJ relied. *See Fenton v. Colvin*, No. 6:14-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) ("The Court is not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but the Court is permitted to consider additional support for a ground on which the ALJ relied.").

examination," and Hume "was able to understand and remember instructions and sustain concentration and attention" during the examination, Tr. 1261, "Mental status: Alert and oriented. Good memory and attention," *and* Def.'s Br. at 6, noting that "Dr. Born's treatment notes do not indicate that he ever performed a mental status examination to objectively test [Hume's] abilities").

For these reasons, the Court concludes that the ALJ's rejection of Dr. Born's opinion evidence was supported by substantial evidence and, therefore, should not be disturbed on appeal.

## II.     STEP FOUR—PAST RELEVANT WORK

Hume next argues that the ALJ's step four finding (past relevant work) was erroneous and not supported by substantial evidence in the record. The Court is not persuaded by Hume's argument.

### A.     Applicable Law

At step four of the sequential evaluation process, "a claimant has the burden to prove that he cannot perform his past relevant work 'either as actually performed or as generally performed in the national economy.'" *Stacy v. Colvin*, 825 F.3d 563, 569 (9th Cir. 2016) (quoting *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th Cir. 2002)). In evaluating a claimant's ability to perform his past work, ALJs can use the "actually performed test" or the "generally performed test." *Id*. (citation omitted).

Social Security Ruling ("SSR") 82-61 explains how the "actually performed test" should be applied: "Under this test, where the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be 'not disabled.'" SSR 82-61, 1982 WL 31387, at *2 (1982). "Regardless of which test is applied at step [four], the ALJ may not classify

a past occupation 'according to the least demanding function.'" *Stacy, 825 F.3d at 569* (citation omitted). In other words, an ALJ may not classify a past occupation "based on [a task] the claimant did less than half the time, and . . . [then] equat[e] that one task with a full time [past] job." *Id.*

**B.     Application of Law to Fact**

In this case, the ALJ concluded that Hume is capable of performing his past relevant work as a surveillance system monitor under both the "actually performed test" and "generally performed test." (Tr. 29.) The Commissioner concedes that the ALJ erred in concluding that Hume could perform his past work as a security system monitor under "generally performed test." (Def.'s Br. at 11.) The pertinent inquiry, then, is whether the ALJ erred in concluding that Hume is capable of performing his past work as a security system monitor under the "actually performed test." (*See* Def.'s Br. at 11, arguing that "[t]he ALJ's finding that Plaintiff could still perform his job as a security system monitor as he actually performed it during the final year-and-a-half is dispositive of Plaintiff's claim for disability benefits," Pl.'s Reply at 4-6, addressing only the "actually performed test" after noting that the Commissioner's previously-described concession).

The SSRs "provide that the ALJ may draw on two sources of information to define the claimant's past relevant work as actually performed: (1) the claimant's own testimony, and (2) a properly completed vocational report." *Lewis, 281 F.3d at 1083.* Here, Hume's "past relevant work as actually performed" was defined based on his own testimony.[3] During the administrative

_____

[3] Hume claims that the ALJ did not rely on Hume's testimony in defining his past relevant work. In support of this argument, Hume notes that, in the portion of his written decision addressing Hume's ability to perform his past work, the ALJ referred only to the VE's testimony that "a person with the claimant's [RFC] of light work and the same nonexertional limitations would be able to perform the above past work." (Tr. 29.) As discussed below, the hearing transcript makes clear that the ALJ and VE relied extensively on Hume's testimony in

hearing, the ALJ asked Hume to describe his past relevant work, which Hume referred to as

"high tech security." (Tr. 42.) Hume testified that "when [he] first started" the job, it involved (1)

dealing with various people who sought access to the facilities Hume monitored, such as

vendors, electricians, and painters, (2) "a lot of computer work, surveillance, camera, monitors,"

(3) "some patrols in all three building and parking lot," and (4) setting up barricades and

furniture for events. (Tr-42-43, 77, 79.) Hume later testified that he "ended up working at the

desk most of the time" during the "last couple of years" of his employment because his employer

"had some cutbacks." (Tr. 43, 76, 79.) The ALJ asked Hume to clarify the nature of his duties

once he was "moved to the more desk job," and Hume testified that the job "basically" consisted

of "looking at monitors" and seeing who was accessing the facilities with badges and clearances,

operating a computer, telephone, and security gate, and examining vehicle contents. (Tr. 43, 76.)

Hume also testified that he no longer had to perform patrols or set up for events during the "last

couple of years." (See Tr. 76, 79-80, "Q. And did you also have to perform patrols? A. Not the

last couple years . . . . Q. Mr. Hume, during your last year and a half [or so], when again you

were sitting down, looking at monitors, letting people in and out, were you setting up barricades

at that point in time? A. Not so much the last couple of years, because of the job cuts . . . . So in

other words no, I didn't do too much of the barricading, [carrying] boxes, and chairs, and tables

---

concluding that he could perform his past work. Further, ALJs are entitled to consult a VE in
assessing whether a claimant can perform past work. *See* 20 C.F.R. § 416.960(b)(2) ("We may
use the services of [VEs] . . . to obtain evidence we need to help us determine whether you can
do your past relevant work, given your residual functional capacity. A [VE] . . . may offer
relevant evidence within his or her expertise or knowledge concerning the physical and mental
demands of a claimant's past relevant work, either as the claimant actually performed it or as
generally performed in the national economy. Such evidence may be helpful in supplementing or
evaluating the accuracy of the claimant's description of his past work. In addition, a vocational
expert . . . may offer expert opinion testimony in response to a hypothetical question about
whether a person with the physical and mental limitations imposed by the claimant's medical
impairment(s) can meet the demands of the claimant's previous work, either as the claimant
actually performed it or as generally performed in the national economy.").

and stuff [for events]. I was mostly working [with] . . . the computer and . . . monitors, . . . the phone, [and monitoring] the door access people [use] coming and going.").

The VE testified that Hume's "security work may be best categorized in two areas": (1) "security guard," which the VE referred to as light, semi-skilled work; and (2) "surveillance system monitor," which the VE referred to as sedentary, unskilled work. (Tr. 71.) Hume's attorney later claimed that Hume was disabled because his security work was actually a "composite job,"[4] and asked whether the VE had testified that Hume's security work was "a composite of security guard and surveillance system monitor, or [whether they were] two different jobs performed at different times" for the same employer. (Tr. 74-75.) The VE testified that he believed the security guard and surveillance system monitor jobs "were performed at different periods of time" based on the VE's "understanding of [Hume's hearing] testimony." (Tr. 75.)

Later on during the hearing, Hume's attorney asked the VE once again whether Hume's security work was a composite job. (Tr. 79.) The VE testified that he could not "completely tell" because Hume testified that his security work "was mostly the monitors and the phone, and the access control" during "the last couple of years," but "there was also discussion . . . about other issues of [setting up] barricades and things [for events]." (Tr. 79.) Thus, the VE testified that he "was unable to tell if all [of] those activities merged into one job at the same time, or if they were separate jobs [at] different times." (Tr. 79.) Immediately thereafter, however, the ALJ asked Hume to clarify whether he continued to set up for events after the cutbacks, and Hume stated that he did not. (*See* Tr. 79-80, "Q. Mr. Hume, during your last year and a half [or so], when

---

[4] "A composite job has 'significant elements of two or more occupations, and as such, ha[s] no counterpart in the DOT.'" *Driskill v. Colvin*, No. 13-1928, 2014 WL 3734309, at *7 (W.D. Wash. July 28, 2014) (citation omitted).

again you were sitting down, looking at monitors, letting people in and out, were you setting up barricades at that point in time? A. Not so much the last couple of years, because of the job cuts . . . . So in other words no, I didn't do too much of the barricading, [carrying] boxes, and [setting up] chairs, and tables and stuff [for events] . . . . I was mostly working everything, you know: the computer and . . . monitors, . . . the phone, [and monitoring] the door access people [use] coming and going.").

Hume now argues that the ALJ erred in finding that he was capable of performing his past work as a surveillance systems monitor, because "the question of whether his prior [security] work was actually performed as part of a composite job was never resolved." (Pl.'s Opening Br. at 9.) Hume also argues that if his security work was a composite job, the ALJ's finding that he was "capable of past relevant work was improperly based on the least demanding aspects of said work." (Pl.'s Opening Br. at 10.) The Court disagrees.

In *Minton v. Colvin*, No. 12-5303–PSG, 2013 WL 5496192, at *1 (N.D. Cal. Oct. 3, 2013), the claimant had worked as a massage therapist and manager "in the same health club." The message therapist job had "medium strength requirements" and the manager job required "only sedentary activity." *Id.* The ALJ found that the claimant could perform her past work as a manager. *Id.* The claimant appealed, arguing that the ALJ "improperly classified" her work at the health club "by referring only to the least strenuous portion of the job [i.e., the sedentary managerial duties, not the medium strength duties of a massage therapist], thereby running afoul" of precedential case law holding that "if a job encompasses more than one DOT code, it is error for the ALJ to classify it according to the least demanding function." *Id.* at *3 (citation, quotation marks, and brackets omitted). The *Minton* court rejected that argument, noting that: (1) although the claimant performed the "jobs at the same location, each constitutes its own separate

occupation under the DOT, and the [VE] treated them as such," (2) the case was comparable to *De Rivera v. Astrue*, No. 10–2417, 2010 WL 4916241, at \*4-5 (C.D. Cal. Nov. 22, 2010), where a VE testified that two past jobs (housekeeper in hotels and homes, which involve light and medium work, respectively) "were entirely separate occupations, not just separate tasks in one," and thus (3) the ALJ did not commit reversible error in finding that the claimant could be employed as a health club manager, even though a massage therapist "lie[d] outside her RFC." *Minton*, 2013 WL 5496192, at \*3.

      Similarly, in this case, the VE expressly considered two separate occupations in Hume's work history: a security guard and a security surveillance monitor. Although Hume performed these jobs at the same location and for the same employer, Hume's testimony clearly established that his employer's cutbacks effectively resulted in him working separate jobs (i.e., because the position turned into a "desk job" as a result of the alteration in Hume's duties), not just separate tasks in one job. That is why the VE treated Hume's work as separate jobs. (*See* Tr. 75, confirming that the VE's testimony concerned "two different sorts of jobs performed at two different times" based on his understanding of Hume's hearing testimony). The VE later expressed uncertainty about whether Hume's security work was a composite job, but the ALJ eliminated any uncertainty by having Hume confirm that he no longer patrolled buildings or set up for events post-cutbacks. In light of the foregoing, the Court concludes that the ALJ did not commit reversible error in finding that Hume could perform his past relevant work as a surveillance system monitor, even though his past work as a security guard may lie outside his RFC. *See also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993) (holding that a claimant's testimony about his past relevant work as actually performed was "highly probative"); *Driskill*, 2014 WL 3734309, at \*8 (noting that a claimant bears the burden of showing that his past

relevant work involved "'significant elements of two or more occupations' and was therefore a composite job").

## III.     THE DOT AND VE'S TESTIMONY

Hume also argues that the ALJ failed to reconcile an apparent conflict between the DOT and the VE's testimony. (Pl.'s Opening Br. at 10.) Specifically, Hume notes that the ALJ found that Hume retains the RFC to perform simple, routine, and repetitive tasks, and make simple work-related decisions; however, the Ninth Circuit has held that there is an apparent conflict between a limitation to "simple, routine, or repetitive tasks" and the DOT's description of the surveillance system monitor occupation, which typically requires the ability to perform "Level 3 Reasoning." *See Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015) (holding that that "there is an apparent conflict between the residual functional capacity to perform simple, repetitive tasks, and the demands of Level 3 Reasoning," and noting that Level 3 Reasoning involves applying "commonsense understanding to carry out detailed but uninvolved written or oral instruction" and dealing "with problems involving a few concrete variables in or from standardized situations").

In *Wolcott v. Colvin*, No. 15-1796, 2016 WL 3549603, at *5 (E.D. Cal. June 30, 2016), as here, the claimant argued that the ALJ's step four finding was erroneous because there was an apparent conflict between the RFC to perform "simple one-two step tasks" and the DOT's description of the cashier occupation, which typically requires the ability to perform Level 3 Reasoning. *Id.* The *Wolcott* court rejected the claimant's reliance on *Zavalin* and found that any error was harmless because the ALJ determined that the claimant could perform her past work as it was actually performed:

> Here, the ALJ evaluated whether plaintiff could perform her past work as a cashier as she had actually performed it and as it was generally performed in the national economy. Even assuming,

without deciding, that the ALJ erred by determining that plaintiff could perform her past work as a cashier as it was performed in the national economy, such an error was harmless in light of the ALJ's alternative determination that plaintiff could still perform such work as she actually had performed it. When determining that a claimant can perform his or her prior work as it was actually performed, an ALJ is not required to consult the DOT because that source addresses an occupation as it is generally performed, not as it is specifically performed by the claimant . . . .

The existence of an apparent conflict between a VE's testimony that the claimant can perform his or her prior occupation and that occupation's DOT listing may be irrelevant to the issue of whether the claimant can still perform work as he or she actually performed it because the DOT's requirements may not match what the claimant actually did while working in that position. Accordingly, the fact that the Ninth Circuit Court of Appeals has found an apparent conflict between an ability to perform only simple one-two step tasks and occupations requiring Level 3 Reasoning does not necessarily mean that the ALJ here erred in relying on the VE's testimony to determine that plaintiff could perform her prior work as a cashier as she actually performed it. An ALJ may consult a VE to aid in making a step four determination and use a VE's testimony as evidence of whether the claimant can perform his or her past work. Therefore, the ALJ's use of such evidence in support of his step four determination was proper.

Moreover, in addition to relying on the VE's testimony, the ALJ also took into consideration plaintiff's own [testimony] regarding how she performed her past work as a cashier. A review of plaintiff's own [testimony] of her past work as a cashier provides substantial support for the VE's testimony and the ALJ's determination that plaintiff could perform such work given her RFC limitation to simple one-two step tasks. In short, the ALJ relied on substantial evidence in the record in rendering his step four determination that plaintiff could perform her past work as a cashier as she actually had performed that occupation. Thus, plaintiff's argument that the ALJ erred at step four is without merit.

*Id.* at *6 (citations and footnotes omitted); *see also Whitney v. Berryhill*, No. 16-00030, 2017 WL 1356034, at *4 (E.D. Cal. Feb. 24, 2017) ("In this case, the ALJ found, based on the testimony of a vocational expert, that Plaintiff could perform her past relevant work as it was actually

performed. [The ALJ] was thus not required to examine the DOT to decide whether Plaintiff was capable of performing her past relevant work as it was generally performed. Consequently, any deviation from the prescribed requirements in the DOT was not error.") (internal citations omitted).

Consistent with *Wolcott* and *Whitney*, this Court rejects Hume's argument that the ALJ committed a harmful error at step four. In applying the actually performed test, the ALJ was "not required to consult the DOT because that source addresses an occupation as it is generally performed, not as it is specifically performed by the claimant." *Wolcott*, 2016 WL 3549603, at *6. Instead, the ALJ was entitled to rely, as he did, on Hume's and the VE's hearing testimony in determining whether Hume could perform his past work under the actually performed test. Accordingly, the Court concludes that the ALJ relied on substantial evidence in rendering his step four determination, and that any failure to reconcile a conflict with the DOT amounted to harmless error. *See also Pruitt v. Comm'r Soc. Sec.*, 612 F. App'x 891, 894 (9th Cir. 2015) ("And, contrary to Pruitt's contention, it is irrelevant that the Dictionary of Occupational Titles states that receptionists must frequently reach but the ALJ found that Pruitt could only occasionally reach. The ALJ was evaluating whether Pruitt could perform her work as she actually performed it—with only occasional reaching—and not as it is generally performed."); *Iqbal v. Comm'r Soc. Sec.*, No. 16-00722, 2017 WL 3475492, at *5 (N.D.N.Y. Aug. 11, 2017) ("As the D.O.T. only speaks to how jobs are generally performed in the national economy, an inconsistency with the D.O.T. between how jobs are generally performed and how a claimant performed them in the past is not determinative if substantial evidence supports a finding that the plaintiff remained able to perform her past relevant work as it was actually performed.") (citation omitted).

## IV. REMAINING ARGUMENTS

Typically, arguments "raised for the first time in a reply brief are waived." *Thacker v. Comm'r Soc. Sec.*, No. 11–00613, 2012 WL 1978701, at *11 (E.D. Cal. June 1, 2012); *see also Zango, Inc. v. Kaspersky Lab, Inc.*, 588 F.3d 1169, 1177 n.8 (9th Cir. 2009) (noting that "arguments not raised by a party in an opening brief are waived"); *Singh v. Ashcroft*, 361 F.3d 1152, 1157 n.3 (9th Cir. 2004) ("Issues not raised in an appellant's opening brief are typically deemed waived."); *Jones v. Astrue*, No. 09-01504, 2010 WL 5111457, at *7 (E.D. Cal. Dec. 9, 2010) ("Because Plaintiff raises this issue for the first time in his reply, he has waived the issue.").

In his reply, Hume argues for the first time that the ALJ erred at step four by failing to make the requisite factual findings to support the conclusion that Hume can perform his past work. *See generally Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) ("Although the burden of proof lies with the claimant at step four, the ALJ still has a duty to make the requisite factual findings to support his conclusion."); *see also* Pl.'s Reply Br. at 4-6, citing *Pinto* for the first time, arguing that "the ALJ made no findings whatsoever as to how Plaintiff *actually performed* his past work," and claiming the ALJ's "error was contrary to the requirements of *Pinto*").

The Court concludes that (1) Hume waived the above challenge to the ALJ's step-four determination by raising it for the first time in his reply, and (2) even if he had not done so, persuasive authority supports the conclusion that the ALJ did not commit reversible error in finding that Hume could perform his past work. *See Kazantseva v. Astrue*, No. 08-206, 2008 WL 4766823, at *7 (W.D. Wash. Oct. 27, 2008) (rejecting the claimant's argument that "the ALJ did not make sufficient factual findings regarding her past work and her ability to perform it," noting that the VE's testimony relied on the claimant's "description of the past work," and holding that

"the ALJ appropriately used a [VE] to determine the type of work [the claimant] performed, and whether she could now perform this past work based on her RFC and limitations he determined applicable"); *Flora v. Berryhill*, No. 16-00252, 2017 WL 2791054, at *10 (M.D. Pa. May 1, 2017) (rejecting the claimant's argument that the ALJ failed to make the requisite factual findings at step four, and noting that the ALJ made a finding of fact as to the claimant's RFC, found that the claimant was capable of performing her past work because it did not require the performance of work-related activities precluded by her RFC, and cited favorably to the VE's testimony in the relevant portion of his decision, which the court "construed as findings of fact regarding the demands of [the claimant's] past relevant work, and [the claimant's] ability to engage in such work"); Tr. 22, 29 (making a finding of fact as to Hume's RFC, citing favorably to the testimony elicited from the VE, which was preceded and informed by Hume's hearing testimony, and finding that Hume could perform the "physical and mental demands" of his past work based on a comparison with his RFC and the VE's testimony "that a person with the claimant's [RFC] of light work and the same nonexertional limitations would be able to perform" such work).

## CONCLUSION

For the reasons stated, the Court AFFIRMS the Commissioner's decision because it is free of legal error and supported by substantial evidence.

IT IS SO ORDERED.

DATED this 11th day of September, 2017.

_____
STACIE F. BECKERMAN
United States Magistrate Judge